## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MICHAEL LEE STROPE                                   )
also known as Gordon Strope,                         )
                                                     )
                          **Plaintiff,**             )
                                                     )          CIVIL ACTION
**v.**                                               )
                                                     )          No. 06-3021-KHV
WILLIAM CUMMINGS, et al.                             )
                                                     )
                          **Defendant.**             )
_____)

### MEMORANDUM AND ORDER

Michael Lee Strope, a former inmate at Lansing Correctional Facility in Lansing, Kansas,

brings suit *pro se* under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons

Act, 42 U.S.C. § 2000cc-1 ("RLUIPA").[1]  In their individual and official capacities, plaintiff sues

William Cummings, Karen Thorne, David McKune, Coi Obeidat, Randy Jewell and Melvin Theisen,

who work for the Kansas Department of Corrections.  This matter is before the Court on Defendants'

Motion for Summary Judgment (Doc. #117) filed October 16, 2008.  In its Memorandum and Order

(Doc. # 64) dated February 22, 2008, the Court dismissed Counts 6, 7, 10, 11, 13 and 17 for failure

to state a claim.  Counts 1 through 5, 8, 9, 12, 14 through 16, and supplemental Counts 1 and 2,

remain in the case.  Defendants seek summary judgment on all claims.

Plaintiff asserts various theories of recovery:

Plaintiff claims that Cummings violated his right to freedom of religion under the First

Amendment by interfering with religious call-outs (Count 1), serving spoiled food to Koshers

(Count 2), denying seasonal fruits and vegetables to Koshers (Count 4) and refusing to provide

sufficient time for Sabbath services (Count 5).  Plaintiff claims that McKune also violated his First

---

[1]        The Court previously dismissed plaintiff's conspiracy claims under 42 U.S.C. § 1985(3).  See Memorandum and Order (Doc. #64).

Amendment right to freedom of religion by interfering with religious call-outs (Counts 9 and 16). Plaintiff claims that Obeidat retaliated against him in violation of the First Amendment by ransacking his cell (Count 12), that Jewell retaliated against him by transferring him to a different cell (Count 14), and that Theisen retaliated against him by calling him out for an early-morning urine test (Count 15). Plaintiff claims that Cummings and McKune violated his Eighth Amendment right to be free from cruel and unusual punishment by showing deliberate indifference to his complaints regarding spoiled food (Count 3 – Cummings) and refusing to stop spoiled food from being served (Count 8 – McKune). Plaintiff claims that Cummings violated the RLUIPA by failing to provide sufficient time for religious call-outs (Count 5), and that Thorne deprived him of due process and violated his First Amendment right to receive information by withholding his newspaper (Supp. Counts 1 and 2). See Pretrial Order (Doc. #116) filed October 10, 2008.[2]

Defendants contend that they are entitled to judgment as a matter of law because plaintiff has not shown (1) that Cummings or McKune substantially burdened plaintiff's free exercise of religion or acted in a manner which was not reasonably related to legitimate penological interests, as necessary to maintain a claim under the First Amendment (Counts 1, 2, 4, 5, 9 and 16); (2) that Obeidat, Jewell or Theisen had retaliatory motives sufficient to maintain retaliation claims under the First Amendment (Counts 12, 14 and 15); (3) that Cummings or McKune denied plaintiff a minimal civilized measure of life's necessities or acted with deliberate indifference to his health and safety, as necessary to maintain a claim under the Eighth Amendment (Counts 3 and 8); (4) that Cummings

---

[2]     In the complaint and response to defendants' motion, plaintiff phrases his allegations as though he brings equal protection claims, i.e. plaintiff argues that Koshers are denied seasonal foods and vegetables which are available on the food main line, and that Protestants have more call-outs than Assembly of Yahweh ("A.O.Y.") followers. As a remedy, plaintiff requests "equal access" to call-outs . See Complaint (Doc. #1) at 13. Plaintiff does not, however, purport to state an equal protection claim in his theories of recovery and in the Pretrial Order (Doc. #116) filed October 10, 2008, makes no references to equal protection.

substantially burdened his religious beliefs or failed to utilize the least restrictive means of furthering a compelling government interest, as necessary to maintain a claim under the RLUIPA (Count 5); and (5) that Thorne violated plaintiff's right to receive information in violation of the First or Fourteenth Amendments (Supp. Counts 1 and 2).

## I.   Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52.

A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252. The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991). Once the moving parties meet their burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which [he] carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). And, while the Court views the record in a light most favorable to the party opposing summary judgment, the nonmoving party may not rest on his pleadings but must set forth specific facts. Id. The nonmoving party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). If the

nonmoving party's evidence is merely colorable or is not significantly probative, summary judgment may be granted.  Liberty Lobby, 477 U.S. at 250-51.

**II.     Facts**

The following facts are uncontroverted or, where controverted, construed in a light most favorable to plaintiff.[3]

At all times relevant to his claims, plaintiff was in the custody of the Kansas Department of Corrections ("KDOC") at the Lansing Correctional Facility ("LCF"), where defendants worked. Cummings was Secretary of Corrections, McKune was warden, Jewell was a Unit Team Manager, and Theisen was a member of the Shakedown Team.  Although the record is not clear, it appears that Obeidat and Thorne were correctional officers.  Plaintiff practices the A.O.Y. faith and is permitted to keep religious material in his cell, which he can use to exercise his religion there.

**Religious Call-Outs and Saturday Sabbath**
**(First Amendment Freedom of Religion and RLUIPA Claims)**

LCF holds A.O.Y. call-outs on Saturday mornings for 25 to 40 minutes and on Tuesday evenings for two hours.[4]

---

[3]      Plaintiff has generally complied with D. Kan. Rule 56.1, the local rule which governs summary judgment and requires a party opposing a motion for summary judgment to begin the opposition with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists, separately numbering by paragraph each fact in dispute, referring with particularity to the portions of the record upon which the opposing party relies, and (if applicable) stating the number of movant's fact that is disputed.  D. Kan. Rule 56.1(b). Occasionally, however, plaintiff improperly attempted to controvert facts with conclusory legal arguments or statements of belief which the Court disregards.  Ferluga v. Eickhoff, No. 05-2338-JWL, 2006 WL 3144218 at *2 (D. Kan. Oct. 31, 2006).  Plaintiff also attached an "affidavit" attesting that the factual information in his summary judgment response is accurate.  Additionally, the Court treats plaintiff's verified complaint as an affidavit which may be used as evidence at the summary judgment stage.  Strope v. Collins, 492 F. Supp. 2d. 1289, 1291 (D. Kan. 2007).

[4]      Though defendants contend that Saturday call-outs last one hour, the parties do not dispute that they last at least 25 to 40 minutes.  Compare Memorandum In Support Of Defendants' Motion For Summary Judgment (Doc. #118) at SOF 4, 25 and Memorandum In Support Of Plaintiffs' [sic] Response In Opposition To Defendants' Motion For Summary Judgment (Doc.
(continued...)

Prison policy restricts inmates from leaving their cells until the moment their call-outs are announced.  Inmates have five to ten minutes to get to their call-outs, and they are sometimes late.  When inmates are released late, they sometimes miss all or part of the call-outs.  The release policy is intended to minimize prison security threats, ensure inmate safety and restrict contraband by forcing inmates to walk directly to call-outs.  Controlling inmate movement is crucial to maintaining prison security because inmates who are allowed relatively unrestricted movement or excessive travel time facilitate the trade of contraband and perpetrate violence against other inmates.  If prison officials allowed inmates an abundance of time to travel from cells to call-outs, the prison would have to hire many more correctional staff and possibly install expensive security equipment.

Between September and December of 2005, plaintiff was sometimes released late for A.O.Y. call-outs.  Specifically, plaintiff was released late on October 8 and 9, December 10, two other unspecified dates between October 9 and December 11, 2005, and some other unspecified dates during the three-week period before October 8.  He therefore missed portions of some call-outs.  Plaintiff missed the entire call-out on October 8.[5]  Plaintiff complained to LCF officials about the late call-outs in grievance #AA20060540 dated November 20, 2005, and grievance #AA20060588 dated December 11, 2005.

The Saturday call-outs for A.O.Y. are held in the mornings because the only room which is large enough for the call-outs is occupied on Saturday evenings by a Protestant group which has held that time slot for many years.  Many volunteers participate in the Protestant call-out and changing the time could endanger the valuable volunteer base.  The Saturday morning service occasionally

---

[4](...continued)
#120) at Statement of Facts ("SOF") 4, citing Doc. #1, Ex. 1a.

[5]      The parties dispute why plaintiff missed the call-out on October 8.  Plaintiff contends that he was released so late that the call-out doors were locked by the time he got there.  Defendants contend that plaintiff made it to the call-out on time but refused to stay after a friend was not admitted to the call-out.  This dispute of fact does not materially affect the outcome of the case.

begins late, so the worship period is shortened.  On October 23, 2005, plaintiff filed grievance #AA20060422, which complained that insufficient time was allotted for A.O.Y. Sabbath services and asked that the call-outs be moved to Saturday evenings so that more time would be available. The prison responded that the primary A.O.Y. call-out was held on Saturday because that is the A.O.Y. Sabbath, that no space for additional call-outs was available on Saturday evenings and that another A.O.Y. call-out was held on Tuesday evenings.  Plaintiff appealed this response to Cummings.  On November 21, 2005, Cummings responded that the only room large enough for A.O.Y. call-outs was occupied on Saturday evenings by a Protestant group which had held that time slot for many years; that changing the Protestant call-out could potentially endanger the large volunteer base; that prison staff would consider moving the A.O.Y. call-out to another day if asked; that prison staff was making all possible efforts to get inmates to call-outs on time; and that plaintiff's request to move the A.O.Y. call-out to Saturday evenings was denied for lack of space and supervision resources.  On November 27, 2005, plaintiff filed grievance #AA20060539, which complained that the time allotted for the Saturday call-out was insufficient and asked that it be held either on Saturday evenings or begin at 8:15 a.m. instead of 8:30 a.m.  The prison responded that the schedule and staff availability prevented adjustment of the Saturday call-out schedule but that adjustments could be made on other days.

## Spoiled and Seasonal Food
### (First Amendment Freedom of Religion and Eighth Amendment Cruel and Unusual Punishment Claims)

At lunch on October 6 and 7 and again at breakfast on November 15, 2005, plaintiff received a rotten orange.[6] Plaintiff complained about the oranges in grievances #AA20060377 dated October 9, 2005 and #AA20060547 dated November 15, 2005.  Plaintiff and other Koshers previously had

---

[6]      Defendants dispute this fact and state the orange rinds were slightly green, but not moldy.

received spoiled food and had been denied seasonal fruits and vegetables.[7]  Except for the three

oranges, plaintiff could not identify or describe specific instances of spoiled food in response to

discovery requests.

In grievance #AA20060377 dated October 9, 2005, plaintiff complained that he had received

rotten food and had complained about it, but that no corrective action had been taken.  In grievance

#AA20060547 dated November 15, 2005, plaintiff complained that Koshers repeatedly received

spoiled foods and that no corrective action had been taken.  On November 30, 2005, plaintiff filed

grievance #AA20060546, which complained that Koshers were denied seasonal fruits and

vegetables all year.[8]  Plaintiff's unit team responded to grievances #AA20060377 and #AA20060547

that the oranges were not rotten and that no further action was necessary.  Plaintiff's unit team

responded to grievance #AA20060546 that they had previously addressed this same complaint in

response to grievance #AA20060596 and that plaintiff had offered no evidence to contradict that

response.  Plaintiff appealed the responses to Cummings, who agreed with the unit team responses

and determined that no further action was necessary.

### Cell-House Move, Urine Test and Shakedown
### (First Amendment Retaliation Claims)

On or about September 14, 2005, Jewell moved plaintiff from A cellhouse to D cellhouse.

Jewell told plaintiff that he was being transferred because he filed too many grievances.[9]  Plaintiff

---

[7]     "Koshers" refers to practitioners such as plaintiff who follow a restricted kosher diet
for religious reasons.

[8]     Plaintiff cites grievance #AA20060539 to support his food-related claims, but this
grievance does not contain food-related complaints.

[9]     By affidavit, Jewell testified that he did not transfer plaintiff for filing grievances,
that he does not recall talking with plaintiff about the transfer, that he does not remember why he
transferred plaintiff and that he believes that he never would have told plaintiff that he was being
transferred for filing grievances.  For purposes of this order, however, the Court accepts plaintiff's
(continued...)

complained about this transfer in grievance #AA20060587 on November 13, 2005.  After plaintiff

filed the November grievance, Classification Administrator Rice ordered that plaintiff not be moved

back to A cellhouse.  Jewell was not involved in this decision and did not oppose moving plaintiff

back.  In December of 2005, plaintiff was moved to a medium security compound which is less

restrictive than either A cellhouse or D cellhouse.  Plaintiff was in constant fear of his safety and

property in that unit.

On October 19, 2005, Theisen gave plaintiff an early-morning urine test.  Theisen

administers urine tests early in the morning so as not to interrupt prisoners' daily activities which

include working, going to yard and eating.  Though plaintiff saw no other inmates when Theisen

gave him the test at 4:00 a.m., Theisen gave urine tests to numerous inmates that day.  In grievance

#AA20060414 filed October 19, 2005, plaintiff complained that Theisen had administered the test

to retaliate against him for filing grievance #AA20060182 on August 17, 2005.  In that grievance,

plaintiff had complained about Theisen giving him an early morning urine test that day and three

urine tests in a six month period.  The prison responded that the urine tests were administered

according to Internal Management Policy and Procedure ("IMPP") 12-124.[10]  In 2005, Theisen gave

plaintiff six urine tests (five random, one for cause).  KDOC decided which inmates would receive

the random tests.  Someone ordered Theisen to give plaintiff the "for cause" test but he does not

recall who gave him that order.  Plaintiff has filed at least one other civil complaint and other

grievances against Theisen.  Theisen recalls one grievance.

On the night of November 24, 2005, Obeidat stopped by plaintiff's cell two or three times.

After the second time, Obeidat shined a flashlight in plaintiff's eyes and plaintiff threatened to file

---

[9](...continued)
version as true.

[10]        The record does not contain IMPP 12-124 or any specific language therefrom.

a complaint against him.  Shortly after midnight on November 25, 2005, Obeidat shook down

plaintiff's cell. Prior to the shakedown, plaintiff was kneeling in prayer.[11]

### Newspapers
### (Due Process and First Amendment Right to Receive Information Claims)

On December 31, 2005, plaintiff submitted a special purchase order for an eight-week

Sunday-only subscription to a New York newspaper called *The Star-Gazette*.  A unit team member

approved the purchase order and plaintiff should have received the first newspaper on Sunday,

January 8, 2006.   He did not receive it or the next three papers for which he had paid., and was not

told that the newspapers were being withheld.  Plaintiff received the last four Sunday newspapers.

Plaintiff filed numerous grievances about the four newspapers which he did not receive.  Prison

officials responded that the newspapers were withheld because of a misunderstanding regarding the

policy about the documentation that was to be provided regarding plaintiff's order, that plaintiff

received all of the papers ordered through a new subscription and that they apologized to plaintiff.

Plaintiff does not recall receiving an apology.

**III.    Analysis**

    **A.        First Amendment Freedom of Religion**

Plaintiff asserts six freedom of religion claims under the First Amendment.  Specifically, he

claims that Cummings and McKune interfered with religious call-outs by failing to prevent him from

being released late (Counts 1, 9 and 16), and that Cummings refused to provide sufficient time for

Sabbath services (Count 5), served spoiled food to Koshers (Count 2), and denied seasonal fruits and

vegetables to Koshers (Count 4).

---

[11]        The parties dispute the events which occurred prior to the shakedown.  Obeidat claims  that he saw plaintiff kneeling close to his electrical outlet, saw a spark and believed that plaintiff was acting suspiciously and sticking wires into the outlet. Plaintiff denies that he was near the outlet or that the outlet sparked.  For purposes of this order, the Court accepts plaintiff's version of the events.

The First Amendment mandates that prisoners be afforded reasonable opportunities to exercise sincerely held religious beliefs. Hammons v. Saffle, 348 F.3d 1250, 1254 (10th Cir. 2003). Free exercise rights are not absolute, however, and they may be restricted by prison regulations that are reasonably related to legitimate penological interests.[12] Id., Beerheide v. Suthers, 286 F.3d 1179, 1184 (10th Cir. 2002) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).  For a prisoner to prove a constitutional violation based on free exercise of religion, he must show that a prison regulation substantially burdened his sincerely held religious beliefs. Kay v. Bemis, 500 F.3d 1214, 1218 (10th Cir. 2007); Wares v. Simmons, 524 F. Supp. 2d 1313, 1319 (D. Kan. 2007).  In other words, plaintiff must show that his beliefs were religious, sincerely held and burdened by the prison regulation or conduct in question.  A "substantial burden" is one that (1) significantly inhibits or constrains plaintiff's religious conduct or expression, (2) meaningfully curtails plaintiff's ability to express adherence to his faith or (3) denies plaintiff reasonable opportunity to engage in fundamental religious activities. Wares, 524 F. Supp. 2d at 1319-20.

If plaintiff does not meet the "substantial burden" test, the inquiry ends; if he does, defendants may identify legitimate penological interests which justify the impinging conduct. Id. The burden then shifts back to plaintiff to show that the articulated concerns were irrational. Id. This analysis enables the Court to determine whether the prison regulation – in its general application – is reasonably related  to legitimate penological interests. Kikumura v. Hurley, 242 F.3d 950, 960 (10th Cir. 2001).  To evaluate reasonableness, the Court examines (1) whether the prison policy is rationally connected to the legitimate governmental interest advanced as its justification; (2) whether, notwithstanding the policy or regulation, alternative means of exercising

---

[12]     Plaintiff challenges individual acts of prison officials, who contend that they acted consistently with prison policy.  Whether plaintiff challenges an official policy or a prison official's act, however, the analysis is the same. Boles v. Neet, 486 F.3d 1177, n.4 (10th Cir. 2007).

the right are available; (3) what effect accommodating the exercise of the right would have on guards, other prisoners and prison resources generally; and (4) whether ready, easy-to-implement alternatives would accommodate the prisoner's rights.  Boles, 486 F.3d at 1181.

With respect to Counts 1, 5, 9 and 16, Cummings and McKune do not challenge the sincerity or religious nature of plaintiff's beliefs but contend that they are entitled to judgment as a matter of law because plaintiff has not shown that they substantially burdened his religious beliefs or acted in ways which were not reasonably related to legitimate penological interests.  With respect to the food claims, Counts 2 and 4, Cummings and McKune contend that plaintiff has not shown that his claims are sincerely religious in nature.

### 1.    Religious Services

Plaintiff's First Amendment right to the free exercise of his religion encompasses the right to attend religious services.  That right is not absolute, however, and it is subject to limitations. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 360 (1987).  Further, "the incidental effects of otherwise lawful government programs which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs do not constitute substantial burdens on the exercise of religion." Thiry v. Carlson, 78 F.3d 1491, 1495 (10th Cir. 1996); see also Mollie v. Ward, 106 F.3d 414, 1997 WL 22525 (10th Cir. 1997).

In Mollie, plaintiff complained that defendants violated his First Amendment free exercise rights by failing to deliver his morning Ramadan meal before sunrise so that he could fast during the day, and forcing him to drop an art class to participate in a specially scheduled evening meal. Id. at *2.  The district court granted summary judgment for defendants.  The Tenth Circuit affirmed, finding that plaintiff had presented no evidence that meals did not arrive in time for him to consistently observe Ramadan and that as a matter of law, conflict between the art class and the

special meal was an inconvenience which did not amount to a "substantial burden." Id.  In sum, the Tenth Circuit held that isolated minor inconsistent interferences with plaintiff's religious observances were not substantial burdens.  Cf. Makin v. Colo. Dep't. Of Corr., 183 F.3d 1205 (10th Cir. 1999) (Muslim plaintiff who received meals at regular meal times during Ramadan demonstrated substantial burden).

### a. Late Call-Outs (Counts 1, 9 and 16)

Plaintiff complains that Cummings and McKune interfered with his ability to attend call-outs by limiting the time for inmates to travel from cells to religious call-outs and causing plaintiff to miss all or part of call-outs on several occasions between September and December of 2005.[13] Cummings and McKune argue that they are entitled to summary judgment because plaintiff has not shown a substantial burden on his religious beliefs or that the travel policy was not reasonably related to legitimate penological interests.  In response, plaintiff argues that the tenets of his religion include having adequate time to get to call-outs and have opening prayer, study and reflection, songs/hymns and a closing prayer, and that defendants intentionally interfered with his ability to attend call-outs.

Plaintiff offers no evidence, however, that his occasional late arrival interferes with the A.O.Y. religious tenets.  Likewise, he offers no evidence that his occasional tardiness significantly inhibited or constrained his religious conduct or expression, meaningfully curtailed his ability to express adherence to his faith or denied him reasonable opportunity to engage in fundamental religious activities.  Wares, 524 F. Supp. 2d at 1319-20.  Further, Cummings and McKune identify legitimate penological concerns – prison security and prisoner safety – to justify limiting call-out

---

[13]     As noted, plaintiff was released late on October 8 and 9, December 10, two other unspecified dates between October 9 and December 11, and some other unspecified dates during the three week period before October 8.

travel time.  Plaintiff offers no evidence that LCF's policy restricting travel time for call-outs is not reasonably related to a legitimate penological interest, or that the legitimate penological concerns identified by Cummings and McKune – prison security and prisoner safety – are irrational. Cummings and McKune are therefore entitled to summary judgment on Counts 1, 9 and 16.

<b>b.      Timing of the A.O.Y. Sabbath Call-Out (Count 5)</b>

Plaintiff complains that Cummings violated his First Amendment free exercise rights by refusing to allot sufficient time for the A.O.Y. Sabbath service and denying his request to move the service from Saturday morning to Saturday evening.[14] Cummings seeks summary judgment because plaintiff has not shown a substantial burden on his religious beliefs.  Plaintiff responds that he is entitled to have "adequate time for the essentials of the faith" and that the tenets of his religion include having opening prayer, study and reflection, songs/hymns and a closing prayer.[15]

The undisputed evidence is that A.O.Y. Sabbath services generally last 25 to 40 minutes but occasionally begin late, that two-hour A.O.Y. services are held on Tuesday evenings and that inmates (including plaintiff) are allowed to keep religious materials in their cells for individual worship.  Though plaintiff contends that moving the A.O.Y. Sabbath service to Saturday evening will fix the problem of services occasionally starting late, he has presented no evidence that insufficient time for the Sabbath service has substantially burdened his ability to freely exercise his religious beliefs.  Cummings is therefore entitled to summary judgment on the First Amendment

---

[14]      Plaintiff also argues that by not moving the Sabbath service, the State of Kansas is promoting one religion over another and discriminating against him because of his religion. Plaintiff, however, brings no Fourteenth Amendment equal protection claims.  See generally Pretrial Order (Doc. #116) filed October 10, 2008.

[15]      Plaintiff also responds that he has a Fourteenth Amendment right not to be discriminated against because of his religion and that the State of Kansas cannot promote one religion over another. Again, however, plaintiff brings no Fourteenth Amendment equal protection claims.  See generally Pretrial Order (Doc. #116).

portion of Count 5.[16]

### 2. Spoiled and Seasonal Food (Counts 2 and 4)

In October and November 2005, plaintiff received three spoiled oranges.  Plaintiff generally complains that Koshers received spoiled food and that Cummings did not provide a kosher diet which included seasonal fruits and vegetables and failed to investigate his complaints.[17]  To support his claims, plaintiff cites only evidence of the three spoiled oranges.  Cummings seeks summary judgment on Counts 2 and 4 on the ground that plaintiff's dissatisfaction with the oranges and his desire for seasonal fruits and vegetables are statements of personal preference, not protected expressions of religious belief, and that plaintiff has not shown that prison food substantially burdened his religious beliefs.  In response, plaintiff states that serving Koshers spoiled food and denying them seasonal fruits and vegetables has the potential to create an unbalanced diet, and is intended to encourage prisoners to abandon kosher diets because other prisoners receive a wide variety of fruits and vegetables.

A prisoner has a First Amendment right to a diet which conforms to his sincerely held religious beliefs.  Smith v. Bruce, 568 F. Supp. 2d 1277, 1282 (D. Kan. 2008) (citing Beerheide v. Suthers, 286 F.3d 1179, 1185 (10th Cir. 2002)).  The First Amendment free exercise clause does not protect mere personal preferences.  Grant v. Matthews, No. 89-3194-R, 1992 WL 160926, at *2 (D. Kan. June 2, 1992).  Where the sincerity of an inmate's beliefs is deemed questionable, courts flatly reject requests for special treatment.  Id. (citing Dunn v. White, 880 F.2d 1188 (10th Cir. 1989)).  The inquiry into the sincerity of a plaintiff's religious beliefs is "almost exclusively

---

[16]     The Court addresses the RLUIPA portion of Count 5 in § III.D, infra.

[17]     In his response to defendants' motion for summary judgment, plaintiff contends that McKune also failed to investigate his complaints about spoiled and seasonal food.  Plaintiff does not assert Counts 2 and 4, however, against McKune.

a credibility assessment," and is not readily susceptible to summary judgment.  Kay v. Bemis, 500

F.3d 1214, 1219 (10th Cir. 2007).  Indeed, summary dismissal on the sincerity prong is appropriate

only in the very rare case in which the plaintiff's beliefs are so bizarre or so clearly nonreligious in

motivation that they are not entitled to First Amendment protection.  Smith, 568 F. Supp. 2d at

1282.

In Smith v. Bruce, this Court refused to grant summary judgment on plaintiff's First

Amendment freedom of religion claim where plaintiff, a Muslim, asserted that he subscribed to a

vegetarian diet as part of sincerely held religious beliefs.  Id.  Defendants argued that plaintiff did

not consistently practice the Muslim faith, and that the Muslim faith did not mandate vegetarianism.

The First Amendment protects genuine and sincere dietary practices even if they are not doctrinally

required, however, and the record supported plaintiff's contention that he followed a vegetarian diet

as part of sincerely held religious belief.  The Court therefore refused to grant summary judgment

to defendants.  Id.

In contrast, plaintiff here presents no evidence that he subscribes to a diet of unspoiled

seasonal fruits and vegetables as part of his sincerely held religious beliefs.  Rather, plaintiff

complains that Koshers receive food which is not as desirable as that offered to other prisoners and

that Koshers are thereby encouraged to abandon their special diets.  The record, however, contains

no evidence that plaintiff or anyone else abandoned their kosher diets, or that the food which

plaintiff has received does not conform to kosher standards.  Moreover, the record contains no

evidence that plaintiff requires the requested food because of his sincere religious beliefs.[18]

Accordingly, the Court finds that though plaintiff has attempted to link his religious belief

to the rotten oranges and lack of seasonal fruits and vegetables, he has not demonstrated a genuine

---

[18]     Plaintiff basically argues (without evidence) that because of his religious beliefs, he
receives lower-quality food than other prisoners.  In essence, plaintiff makes a disparate treatment
argument to support his First Amendment free exercise claim.

issue of material fact whether he requires the requested food because of his sincere religious beliefs. Further, plaintiff has not demonstrated a genuine issue of material fact whether receiving three rotten oranges or lacking seasonal fruits and vegetables has substantially burdened his religious belief. Therefore, Cummings is entitled to summary judgment on Counts 2 and 4.

### B.    First Amendment Retaliation

Plaintiff asserts three retaliation claims: (1) that Obeidat retaliated against him by ransacking his cell (Count 12); (2) that Jewell retaliated against him by transferring him to another cell block (Count 14); and (3) that Theisen retaliated against him by conducting an early morning urine test (Count 15).

Prison officials may not retaliate because an inmate exercises his constitutional rights, even if the retaliatory action is otherwise permissible. Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998). Inmates are not free from the normal conditions of confinement, however, merely because they engage in protected activity. Id.

To state a First Amendment retaliation claim, plaintiff must prove that (1) he engaged in constitutionally protected activity; (2) defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) plaintiff's participation in constitutionally protected activity substantially motivated defendant's adverse action. Mimics, Inc. v. Village of Angel Fire, 394 F.3d 836, 847 (10th Cir. 2005). To do so, plaintiff must prove specific facts that "but for" the retaliatory motive, the retaliatory action would not have taken place. Peterson, 149 F.3d at 1144. Mere allegations of retaliatory motive are insufficient to defeat summary judgment. Mollie, 1997 WL 22525, at *1; see also Liberty Lobby at 256 (to defeat summary judgment, nonmoving party must set forth specific facts); Smith v. Marcher, 899 F.2d 940, 948 n.4 (10th Cir. 1990) (plaintiff must produce evidence of improper motive rather than rely upon allegations to defeat summary judgment). Circumstantial evidence of

motive – such as suspicious timing of discipline – may be sufficient to preclude summary judgment because the ultimate fact of retaliation turns on defendants' state of mind, which is particularly difficult to establish by direct evidence.  Id. at 948-49.

### 1.     Shakedown (Count 12)

In Count 12, plaintiff alleges that Obeidat retaliated by ransacking his cell after plaintiff threatened to file a complaint against him.  Obeidat seeks summary judgment on the ground that plaintiff cannot prove a retaliatory motive, i.e. but for the alleged retaliatory motive, plaintiff's cell would not have been searched.  Plaintiff responds that factual disputes prevent summary judgment on this claim.

It is undisputed that Obeidat stopped by plaintiff's cell two or three times on the night of November 24 - 25, 2005 and that he shook down plaintiff's cell. The parties agree about little else. Obeidat contends that he repeatedly saw plaintiff near his electrical outlet, that he believed that plaintiff was acting suspiciously, that he saw a spark come out of the outlet and that he searched plaintiff's cell because he believed that plaintiff that was sticking wires into the outlet. Plaintiff claims that he was praying whenever Obeidat came by his cell, and that Obeidat searched his cell after plaintiff threatened to file a complaint against Obeidat for shining a flashlight in his eyes. Viewing the record in the light most favorable to plaintiff, a reasonable jury could find that Obeidat retaliated against plaintiff.  Factual disputes preclude summary judgment on Count 12.

### 2.     Cell Transfer (Count 14)

In Count 14, plaintiff claims that Jewell retaliated by transferring him to a different cell block because he filed so many grievances.  Jewell seeks summary judgment on the grounds that (1) plaintiff cannot prove that the transfer injured him and (2) no reasonable juror would believe that he told plaintiff that he was retaliating against him.  In response, plaintiff reiterates that Jewell told him he was being moved for filing too many grievances and suggests that he suffered injury because

the transfer was to a more restricted cellhouse.[19]

The record is undisputed that plaintiff has filed numerous grievances, that in September of 2005 plaintiff transferred from A cellhouse to D cellhouse, and that a prison staff member ordered that plaintiff not be transferred back to A cellhouse after he filed a grievance in November of 2005. Also, a material dispute of fact exists over whether Jewell told plaintiff that he was transferring him because he filed so many grievances, which can only be resolved through a credibility determination that the Court is unable to make. Liberty Lobby, 477 U.S. 242 at 255. This material dispute, together with the chronology of events, precludes summary judgment on these grounds. A reasonable jury could indeed find that Jewell transferred plaintiff to a more restricted cellhouse because he filed so many grievances.

Further, the Court is unable to conclude as a matter of law that plaintiff has insufficiently alleged injury. While the Court agrees that evidence of injury is scant, the record contains evidence that plaintiff was "in constant fear of his safety and property" while in the medium security unit, from which the Court infers that plaintiff alleges he suffered emotional distress, an injury for which he could possibly recover nominal and punitive damages. See Love v. Behler, No. 00-CV-3059-JWL, 2000 WL 1859003, at *5 (D. Kan. Nov. 28, 2000). Accordingly, Jewell is not entitled to summary judgment on Count 14.

### 3. Urine Test (Count 15)

In Count 15, plaintiff claims that on October 15, 2005 Theisen gave him an early-morning urine test in retaliation for grievances and a civil suit which plaintiff had filed against him. Theisen

---

[19]     Plaintiff also argues that this claim is viable because several years ago a jury found in his favor in another retaliation case. There, the jury awarded him $12.85 in damages on claims that two LCF officials (neither of whom are defendants in this case) retaliated against him for filing grievances. The jury rejected plaintiff's retaliation and conspiracy claims against other defendants, and the Court overruled plaintiff's motion for a new trial. See Strope v. Gibbens, No. 01-CIV-3358-KHV, 2004 WL 2519238 (D. Kan. Nov. 8, 2004).

seeks summary judgment on the ground that plaintiff cannot show that he had a retaliatory motive or that any such motive was the "but for" cause of plaintiff's urine test. Plaintiff responds by arguing that the test was indeed retaliatory, that grievance #20060414 was only one of many which he filed against Theisen, and that given the "history" between them, retaliation can be inferred.[20]

Theisen administers random urine tests early in the day to minimize interruptions to inmates' daily activities. Though it is not clear whether Theisen gave early-morning tests to other inmates on October 15, 2005, he did give urine tests to numerous inmates on that day. On October 19, 2005, plaintiff filed grievance #AA20060414 which complained that Theisen had given him the test to retaliate against him for filing grievance #AA20060182 on August 17, 2005, which complained about Theisen giving him a prior urine test. In 2005, Theisen administered one urine test on plaintiff for cause because someone ordered him to do so, and five random tests on plaintiff because KDOC instructed him to do so.

Plaintiff offers the following evidence of retaliatory motive: (1) he and Theisen have a "history" because plaintiff has filed numerous grievances and complaints against Theisen, (2) Theisen recalls one of the grievances, (3) plaintiff filed a grievance against Theisen on August 17, 2005 complaining about a retaliatory urine test and (4) Theisen gave plaintiff an early morning urine test on October 19, 2005. While this two month span stretches the boundaries, the Court cannot conclude as a matter of law that no causal link exists between plaintiff's constitutionally protected activity (his grievance of August 17, 2005) and the alleged retaliatory conduct which occurred almost two months later. See, e.g., Quintana v. Edmond, No. 06-cv-1187-WDM-KLM, 2008 WL

---

[20]    Plaintiff also responds by stating that Theisen "abandoned" his retaliatory conduct after prison administration "forced" him to "back off," though it is unclear from plaintiff's testimony how he has personal knowledge of these facts. Plaintiff also seems to argue that Theisen's evidence is insufficient because it does not identify the supervisor who ordered the "for cause" urine test and does not include documentation of the random tests. Though plaintiff apparently disagrees with Theisen's factual contentions, he provides no evidence to controvert them.

3539265, at *11-12 (D. Colo. Aug. 12, 2008) (two month span between grievance and adverse action sufficiently close to infer retaliation).

Further, while Theisen offers evidence that someone ordered him to do the "for cause" test in 2005, and KDOC ordered five other random tests in 2005, he does not explain whether the test on October 19, 2005 was random or for cause or who allegedly ordered it. Theisen testifies that he generally conducts urine tests early in the morning to avoid disrupting the inmate schedules, but he does not explain whether he conducted the October 19, 2005 test at 4 a.m. for that reason. While the Court is mindful that plaintiff cannot defeat summary judgment merely by alleging retaliatory motive, genuine issues of material fact as to Theisen's motive and conduct preclude summary judgment on Count 15.

**C.      Eighth Amendment Cruel and Unusual Punishment (Counts 3 and 8)**

Plaintiff alleges that  in violation of the Eighth Amendment, Cummings was deliberately indifferent to his complaints about spoiled food and McKune refused to stop spoiled food from being served.  Specifically, plaintiff complains that Cummings did not investigate his claims about spoiled food and that McKune refused to stop spoiled food from being served.  Cummings and McKune seek summary judgment on the ground that plaintiff has no evidence that they denied him a minimal civilized measure of life's necessities or were deliberately indifferent to his health and safety.

Prisoners are entitled to nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to their health and well being.  Ramos v. Lamm, 639 F.2d 559, 570-71 (10th Cir. 1980).  A substantial depravation of food may be serious enough to state an Eighth Amendment claim, but minor deprivations for short periods do not. Thompson v. Gibson, 289 F.3d 1218, 1222 (10th Cir. 2002); Wolters v. Estate of Conner, No. 03-CIV-3251-KHV, 2005 WL 1842841, at *4 (D. Kan. July 29, 2005).  To state an Eighth Amendment food deprivation claim, plaintiff must allege (1) a sufficiently serious deprivation of the minimal

civilized measure of life's necessities and (2) deliberate indifference by prison officials to a substantial risk of serious harm. Strope v. Sebelius, 189 Fed. Appx. 763, 766 (10th Cir. 2006); Strope v. McKune, No. 03-3310-JAR, 2004 WL 1737694, at *2 (D. Kan. July 29, 2004).

It is undisputed that in October and November 2005, plaintiff received three rotten oranges. Plaintiff generally complains that the prison served spoiled food and failed to provide seasonal fruits and vegetables and that Cummings and McKune neither investigated nor corrected the problem. The parties dispute the degree to which Cummings and McKune investigated plaintiff's claims, but it is undisputed that they answered plaintiff's grievances on this subject and concluded that no action was warranted.

Even taking plaintiff's allegations as true, plaintiff has not demonstrated anything more than a minor deprivation. Cf. Wolters v. Estate of Connor, 2005 WL 1842841, at *4-5 (where plaintiff did not receive some menu items, warden cut menu portions, and plaintiff lost significant weight and suffered from extreme fatigue, plaintiff stated Eighth Amendment claim) and Sawyer v. Jeffries, No. 08-3016-SAC, 2008 WL 489275, *3 (D. Kan. Feb. 20, 2008) (no Eighth Amendment violation where plaintiff placed on sack meals for two weeks). Accordingly, the Court sustains defendants' motion with respect to Counts 3 and 8.

**D.     RLUIPA (Count 5)**

In Count 5, plaintiff claims that Cummings violated the RLUIPA by failing to provide sufficient time for Saturday Sabbath services. Cummings seeks summary judgment on the ground that plaintiff has not demonstrated that insufficient time for the A.O.Y. Sabbath service substantially burdened his religious beliefs. Cummings further contends that as a matter of law, the restriction imposed was the least restrictive means of furthering a compelling government interest. Plaintiff responds that he was denied equal access to religion because he and other A.O.Y. members are routinely released late for call-outs and defendants refused to adjust the call-out time or grant make-

up time.

Under the RLUIPA, a prison cannot substantially burden an inmate's religious exercises unless it demonstrates that imposing the burden is (1) in furtherance of a compelling governmental interest and (2) the least restrictive means of furthering that compelling interest.  Ahmad v. Furlong, 435 F.3d 1196, 1197 (10th Cir. 2006); 42 U.S.C. § 2000cc-1(a).  It defines religious exercise to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).  To bring a claim under the RLUIPA, plaintiff must make a threshold  showing that the government has substantially burdened his religious exercise.  Moore Bey v. Douglas Co. Corr. Fac., No. 08-3036-JAR, 2008 WL 2783140 at *3 (D. Kan. July 15, 2008);. The Tenth Circuit applies the same "substantial burden" test to free exercise claims under the First Amendment and RLUIPA.  Id.

As noted, plaintiff has not shown a "substantial burden" in connection with his First Amendment claims.  Accordingly, he cannot meet such a burden under the RLUIPA.  The Court therefore sustains Cummings' motion for summary judgment on Count 5.

### E.    First Amendment Right to Receive Information and Due Process (Supplemental Counts 1 and 2)

In Counts 1 and 2 of his Supplemental Complaint, plaintiff claims that Thorne violated his First Amendment and due process rights by withholding four newspapers which he ordered.  Thorne seeks summary judgment on the ground that withholding plaintiff's four newspapers does not rise to the level of a constitutional violation.  Plaintiff responds that he has First and Fourteenth Amendment rights to order and receive newspapers, to be free from unlawful censorship and to receive information while in prison, that he properly followed procedure when he ordered the newspapers, that Thorne intentionally withheld the newspapers in violation of the First Amendment, and that Thorne did not notify him that she was doing so, in violation of his due process rights.

The parties do not dispute that on December 31, 2005 plaintiff submitted a special-purchase order for an eight-week Sunday-only subscription to a newspaper called *The Star-Gazette*, and that plaintiff's unit team member approved the purchase order.  Plaintiff should have received his first paper on Sunday, January 8, 2006.  He did not receive it or the next three papers for which he had paid.  Plaintiff received the last four Sunday newspapers.  Plaintiff filed numerous grievances about the four newspapers which he did not receive.  Prison officials responded that the newspapers were withheld because of a misunderstanding regarding the policy about the documentation that was to be provided regarding plaintiff's order, and plaintiff received all of the papers ordered through a new subscription.[21]

### 1.       First Amendment Right to Receive Information (Supp. Count 1)

Prisoners have a First Amendment right to receive information while in prison, to the extent the right is not inconsistent with prisoner status or the prison's legitimate penological interests.  Strope v. Collins, 492 F. Supp. 2d. 1289, 1295 (D. Kan. 2007).  To determine whether an act or policy is reasonably related to legitimate penological interests, courts analyze four factors: (1) whether a valid and rational connection exists between the act and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of ready alternatives.  Id. (citing Turner, 482 U.S. at 89).

An "isolated delay or other relatively short-term, noncontent-based disruption in providing inmate reading materials does not state a cause of action based on the First Amendment."  Faughn v. Campbell, No. 88-3476-DES, 1992 WL 373957, at *3 (D. Kan. Nov. 16, 1992) (citing Sizemore v. Willard, 829 F.2d 608 (7th Cir. 1987)).  With respect to plaintiff's First Amendment claim, the

---

[21]       The record is unclear as to whether plaintiff or the prison ordered and paid for the new subscription.

Seventh Circuit holding in <u>Sizemore</u> is instructive.  In <u>Sizemore</u>, plaintiff subscribed to a variety of periodicals and at least one daily newspaper.  Plaintiff alleged that for several years, prison officials interfered with his "regular and timely" receipt of the periodicals by failing to deliver several issues per week, withholding issues for several days, delivering them out of sequence and withholding them for personal use in violation of the First Amendment.  <u>Id.</u> at 609.  The Seventh Circuit held that plaintiff's First Amendment claim was sufficient to withstand a motion to dismiss.  In so doing, it cautioned that "merely alleging an isolated delay or some other relatively short-term, non content-based disruption in the delivery of inmate reading materials will not support, even as against a motion to dismiss, a cause of action grounded upon the First Amendment."  <u>Id.</u> at 610.

The Court therefore analyzes the foregoing four factors in light of the principle that isolated, noncontent-based disruption in providing reading materials is not a constitutional violation.  As to factor one, the court cannot find as a matter of law that Thorne withheld the newspapers in furtherance of a legitimate governmental interest, because Thorne has not identified what governmental interest is even theoretically at stake.  Thorne argues that she withheld the papers because of a policy misunderstanding, but she provides no evidence about the policy, what it required, what caused her to misunderstand it, or what governmental interest the policy purported to advance.  Therefore the Court cannot conclude that Thorne's act of withholding newspapers was reasonably related to a legitimate penological interest.  Accordingly, her motion for summary judgment on Supplemental Count 1 is overruled.

### 2.  Fourteenth Amendment Procedural Due Process (Supp. Count 2)

Prisoners and publishers have a right to procedural due process when publications are rejected.  <u>Jacklovich v. Simmons</u>, 392 F.3d 420, 433 (10th Cir. 2004).  This right derives from the qualified liberty interest in receiving uncensored communications which are protected by the First Amendment.  <u>Id.</u>  Minimum procedural safeguards must accompany a decision to withhold delivery

or censor incoming prison mail.  Id.  These minimum safeguards include notifying inmates and publishers that a publication will not be delivered.  Id.

Thorne seeks summary judgment on the ground that plaintiff alleges a deprivation of personal property which is redressable through post-deprivation state law proceedings and is not a federal constitutional violation.  The Court disagrees.  Thorne cites McCormick v. Morrison, No. 07-2605-SAC, 2008 WL 4216115, at *3 (D. Kan. Sept. 12, 2008), in which the Court found that plaintiff's supplemental complaint violated Rules 20(a)(2) and 18(a), Fed. R. Civ. P., because it did not state a federal constitutional violation and was unrelated to other claims in the case.  There, plaintiff's supplemental complaint alleged that a prison employee seized and ripped up magazines which he kept in his cell, and sought damages from another defendant who refused to return them. Id.  The Court held that the claim was improperly joined, stating as follows:

> At first glance, it appears this claim might be properly joined since plaintiff seeks relief from defendant Collins rather than Parks whom he alleges actually took and destroyed his property.  However, the facts alleged by plaintiff fail to state a claim of federal constitutional violation.  Whether negligent or intentional, deprivations of personal property effected through the random and unauthorized conduct of a prison employee, may be redressed through adequate post-deprivation remedies, and such remedies are available in the courts of the State of Kansas. Because such post-deprivation remedies are available, plaintiff's allegations do not amount to a claim of deprivation of property without due process.  See Parratt v. Taylor, 451 U.S. 527, 540-42 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-331 (1986); Hudson v. Palmer, 468 U.S. 517, 532-34 (1984) ("An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.").  Plaintiff's conclusory claim of a First Amendment violation based on this incident is not supported by sufficient facts or legal theory.

Id.  Essentially, the Court found in McCormick that plaintiff had improperly attempted to turn a state-law conversion claim into a federal due process claim so that he could include it in a pending federal lawsuit.  McCormick is therefore inapposite.

As noted, the Tenth Circuit recognizes that inmates and publishers have procedural due

process rights when publications are rejected.  Jones v. Salt Lake County, 503 F.3d 1147, 1164 (10th Cir. 2007).  Due process is not implicated, however, when an official negligently withholds otherwise protected information.  Id. (citing  Daniels v. Williams, 474 U.S. 327, 328 (1986) (due process clause is not implicated by a *negligent* act causing unintended loss of or injury to life, liberty, or property)).  In essence, negligence operates as an affirmative defense to a prisoner's due process claim, because due process liability must be predicated upon a deliberate constitutional deprivation.  Jones, 503 F.3d at 1163.

Thorne does not allege negligence as a defense to plaintiff's due process claim, and the evidence is insufficient for the Court to determine that, as a matter of law, her acts were negligent rather than intentional.  Indeed, the record contains no evidence why she failed to notify plaintiff that his newspapers would not be delivered.  Accordingly, Thorne's motion for summary judgment on Supplemental Count 2 is overruled.

**IV.    Summary**

For the reasons stated above, the Court sustains defendants' motion for summary judgment on counts 1 - 5, 8, 9 and 16.  The Court overrules defendants' motion with respect to Counts 12, 14, 15 and Supplemental Counts 1 and 2.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. #117) filed October 16, 2008 be and hereby is **SUSTAINED** in part and **OVERRULED** in part as set forth more fully herein.  The Court **SUSTAINS** defendants' motion for summary judgment on counts 1 - 5, 8, 9 and 16, and **OVERRULES** defendants' motion with respect to Counts 12, 14 and 15 and Supplemental Counts 1 and 2.

Plaintiff's First Amendment retaliation claims (Counts 12, 14, and 15), First Amendment right to receive information claim (Supplemental Count 1) and Fourteenth Amendment due process claim (Supplemental Count 2) remain for trial.

Dated this 26th day of February, 2009, at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge